**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| **JAMIE L. VANLANDINGHAM**, | ) | |
| | ) | |
| **Plaintiff**, | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 09-BE-0281-NW** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On July 11, 2006, the claimant, Jamie Vanlandingham, applied for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act, respectively. (R.64, 71). The claimant alleges disability commencing on October 31, 2005 because of a learning disability, attention deficit disorder (ADD), depression, and back pain. (R. 84, 95-96). The Commissioner denied the claim. (R. 43). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held an initial hearing on February 5, 2008. (R. 4, Supplemental R. 1). The ALJ held a supplemental hearing on August 8, 2008. (R. 26). In a decision dated August 27, 2008, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and thus, was ineligible for disability insurance benefits and supplemental security income. (R. 21). On January 5, 2009, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has

exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review: (1) whether the ALJ's finding that the claimant failed to meet listing 12.05C is based on substantial evidence; (2) whether the ALJ properly considered the effect of the claimant's back pain on her residual functioning capacity; (3) whether the ALJ failed to take the claimant's obesity into account when determining her medical impairments; and (4) whether the ALJ erred in ignoring the opinion of the claimant's chiropractor.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence.  *See* 42 U.S.S. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No. . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims."  *Walker*, 826 F.2d at 999.  The court does not review the Commissioner's factual determinations *de novo*.  The court will affirm those factual determinations that are supported by substantial evidence.  "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402

U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the opinion of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

>    (1) Is the person presently unemployed?
>    (2) Is the person's impairment severe?
>    (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
>    (4) Is the person unable to perform his or her former occupation?
>    (5) Is the person unable to perform any other work within the economy?
>
>    An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

Section 12.05 of the Listing of Impairments describes the criteria for mental retardation. It states:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports the onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied...C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

*Hodges v. Barnhart*, 276 F.3d 1265, 1268 (11th Cir. 2001) (*quoting* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05).  In general, a claimant meets the criteria for presumptive disability under section 12.05C when she has a valid IQ score of 60 through 70 inclusive, and presents evidence of an additional mental or physical impairment significantly affecting claimant's ability to work.  *See Crayton v. Callahan*, 120 F.3d 1217, 1219-20 (11 th Cir. 1997).  However, a valid IQ score is not conclusive of mental retardation where the IQ score is inconsistent with other evidence in the record concerning the claimant's daily functioning.  *See Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir.1992).

In considering whether to remand a case to the Social Security Administration, remand is appropriate when the claimant can show that: "(1) new, noncumulative evidence exists, (2) the evidence is material such that a reasonable possibility exists that the new evidence would change the administrative result, and (3) good cause exists for the applicant's failure to submit the evidence at the appropriate administrative level." *Fagle v. Apfel*, 150 F.3d 1320, 1323 (11th Cir. 1998).

## V. FACTS

The claimant has a tenth-grade education and was twenty-five years old at the time of the administrative hearing. (Supplemental R. 4).  The ALJ found that the claimant has no past relevant work experience.  (R. 16).  The claimant alleges she has been unable to work since

October 31, 2005 because of a learning disability and back pain.  (R. 84, 95).

*Mental Impairment Treatment History*

The claimant attended Riverbend Center for Mental Health ("Riverbend") for treatment of her mental impairments between June 1992 and September 1994.  (R. 149-62).  On June 10, 1992, the claimant first visited Riverbend complaining of problems at school including difficulty staying in her seat, sustaining attention, and listening.  During her intake and clinical assessment, Dr. Joseph W. Glaster, a psychiatrist, diagnosed the claimant with attention deficit hyperactive disorder (ADHD) and chronic ear infections.  (R. 159).  On June 30, 1992, Dr. Keith C. Porter, a psychiatrist and treating physician, evaluated the claimant at Riverbend and started her on Ritalin.  (R. 158).

On August 6, 1992, the claimant visited Dr. Porter for a follow-up.  Dr. Porter's treatment notes indicated that the claimant experienced some improvement on Ritalin, but the improvements had been relatively minor.  Dr. Porter noted that the claimant had tolerated the medication well and increased her dose of Ritalin.  (R. 156).  On December 11, 1992, the claimant had another follow-up examination with Dr. Porter.  At that visit, Dr. Porter noted that the claimant's mother reported a fairly dramatic improvement in the claimant while on medication and denied side effects.  Dr. Porter continued the claimant on Ritalin.  (R. 155).

At a follow-up visit on March 31, 1993, Dr. Porter noted that the claimant continued to do well on her medication.  Dr. Porter discontinued the claimant's medication for the summer months.  (R. 154).  At the claimant's next visit on August 19, 2003, Dr. Porter noted that the claimant had a fairly dramatic response to her medication during the past school year and prescribed Ritalin again for the following school year.  (R. 153).

On March 25, 1994, Dr. Porter reported that the claimant continued to do well on medication, but she was having some difficulties with afternoon homework.  Dr. Porter prescribed an additional afternoon dose of Ritalin for the claimant.  (R. 152).  On May 27, 1994, Dr. Porter again discontinued the claimant's Ritalin prescription for the summer and noted the claimant's drop in her grades that academic year.  (R. 151).

On September 26, 1994, the claimant visited Dr. C. Wayne Melvin, a psychologist and treating physician, at Riverbend.  Dr. Melvin reported that the claimant's mother stated that the claimant's attention span had increased and her grades had improved dramatically while on Ritalin.  Dr. Melvin restarted the claimant on the same dosage of Ritalin that Dr. Porter had previously prescribed.  (R. 149).

Twelve years later, on August 30, 2006, the claimant visited Dr. Bonnie L. Atkinson, a consulting psychologist, for a psychological examination at the request of the Social Security Administration.  Dr. Atkinson stated that the claimant had problems with hearing during the examination.  (R. 176).  In Dr. Atkison's statement of the claimant's psychiatric/psychological history, the claimant reported that she had no history of psychiatric hospitalization, but she had received outpatient psychotherapy.  The claimant described her emotional symptoms to Dr. Atkinson as feeling depressed, crying, loss of memory, and feeling like no one wants to hire her to work.  The claimant also reported physical abuse as a child by her mother's boyfriend.  (R. 177).

In Dr. Atkinson's statement of the claimant's psycho-social history, she noted that the claimant reported having friends and opined that the claimant appeared to have no problems relating to others.  Dr. Atkinson reported that the claimant could read and write poorly.  Dr.

Atkinson's notes indicated that the claimant last worked in June 2005 and had been fired for her work speed.  Dr. Atkinson also noted that the claimant's employment history demonstrated few attempts at employment.  (R. 178).

Dr. Atkinson reported that the claimant was obese with a body mass index of 35.  (R. 178).  Further, Dr. Atkinson's examination notes stated that the claimant prepared simple meals, did housework with her husband's help, and performed her own routine hygiene. (R. 180).  During a mental status exam, Dr. Atkinson noted that the claimant was able to maintain focus sufficient for responding to interview questions.  Dr. Atkinson's examination indicated that the claimant's thought and concentration were normal, her language concentration was poor, her speech was clear, and her memory functions were normal.  Based on clinical observations, Dr. Atkinson opined that the claimant was likely to be functioning in the "slightly below average range."  (R. 178-79).  Dr. Atkinson did not observe any anxiety and noted that the claimant appeared calm.  Dr. Atkinson further reported that the claimant's mood was seen as depressed and the claimant appeared cheerless.  (R. 179).

Dr. Atkinson administered the Wechsler Adult Intelligence Scale - Revision III (WAIS-III) and the test revealed the claimant had a Verbal IQ of 70, Performance IQ of 86, and a Full Scale IQ of 76.  Dr. Atkinson noted that the scores fell within the Borderline range of cognitive ability and reported a Global Assessment of Function score of 65.  Dr. Atkinson diagnosed the claimant with rule out mood disorder not otherwise specified, nicotine dependence, borderline intellectual functioning, back pain, and obesity.  (R. 180).  Dr. Atkinson concluded that the claimant was not mentally ill nor mentally retarded.  (R. 181).

On September 8, 2006, Dr. Gloria Roque, a consulting psychologist, performed a

psychiatric review technique.  (R. 183).  Dr. Roque opined in her summary conclusions that the

claimant experienced moderate limitations in some areas of understanding and memory,

sustained concentration and persistence, social interaction, and adaptation.  (R. 197-98).

*School Records*

The claimant attended Lauderdale County public schools in the state of Alabama through

the tenth grade.  (R. 107).  Her elementary school records show that the claimant repeated third

grade.  During her second year in third grade, the claimant received average grades of all As and

Bs.  (R. 128).

The claimant's fourth grade Stanford Achievement Test scores indicated that the claimant

performed average on may portions of the test and below average on many portions of the test.

Overall, the claimant's School Ability Index (SAI) score was 70.  (R. 125).  In fifth grade, the

claimant had an SAI score of 64 on the Stanford Achievement Test.  Additionally, on her

Alabama Direct Assessment of Writing that year, the claimant scored a level two, which

indicated a good attempt with some success in organization and clarity.  (R. 124).

In sixth grade, the claimant's Stanford SAI score went up to a total of 74.  (R. 122).  In

seventh grade the claimant scored an SAI of 75 on the Stanford Achievement Test and a level

three response on the Alabama writing assessment. (R. 117-18).  In eighth grade the claimant had

a SAI total score of 73 (R. 111).

In 1997, the claimant failed her school eye examination.  The school nurse noted that her

glasses were too small and stated that the claimant needed a referral.  (R. 115).  In 1998, the

claimant's mother gave permission for the school to evaluate the claimant for eligibility for

special education services.  (R. 114).

*Back Pain Treatment History*

On February 2, 2004, the claimant visited The Family Practice clinic with complaints of arthritis in her hands, knees, neck, and back.  (R. 163).  The treatment notes from her visit indicate that the claimant had a full range of motion in her back and her spinal curvature was within normal limits.  (R. 164).

The claimant received treatment from Dr. H.M. Ballard, a treating chiropractor, for neck pain, right shoulder pain, and tension headaches from February 23, 2004 through March 3, 2004. The record does not contain the treatment notes from each visit to Dr. Ballard's clinic; however, in a letter dated February 14, 2007, Dr. Ballard reported that exam and x-ray findings were consistent with scoliosis producing muscle spasms and neural stretching in the cervical (neck) region.  Dr. Ballard indicated that the claimant received corrective chiropractic treatment with relief of the present symptoms.  (R. 221).

In March 2005, the claimant visited Dr. Gerald Cunningham, a treating chiropractor, six times for treatment of her back pain.  On March 2, 2005, the claimant's first visit to Dr. Cunningham, the claimant reported that her pain was between a four and a five on a scale of one to ten. Dr. Cunningham treated the claimant's back during the visit and advised her to rest and ice at home.  (R. 206).  At each subsequent visit to Dr. Cunningham, the treatment notes indicated that the claimant's pain was improving.  (R. 207-10).  On March 28, 2005, the claimant told Dr. Cunningham that her pain was down to a one on a scale of one to ten.  Dr. Cunningham noted the claimant's good improvement and advised her to stretch twice a day.  (R. 211).

During the year from December 6, 2005 through December 27, 2006, the claimant visited Dr. Cunningham on nine occasions complaining of headaches, neck pain, and back pain.  On

December 6, 2005, the claimant told Dr. Cunningham she experienced neck pain and headaches. Dr. Cunningham noted that the claimant had "very good relief after treatment" at that visit.  (R. 212).  At her treatment appointment on January 18, 2006, Dr. Cunningham again noted claimant had very good improvement after that day's treatment.  (R. 213).  On April 17, 2006, the claimant reported to Dr. Cunningham that she experienced lower back pain after moving furniture the previous day.  (R. 216).  When the claimant returned to Dr. Cunningham on May 1, 2006 complaining of neck pain, Dr. Cunningham noted "very good improvement after adjustment."  (R. 217).  On December 27, 2006, the claimant visited Dr. Cunningham complaining of neck pain that was a five on a scale of one to ten.  After treatment, Dr. Cunningham again reported very good improvement.  (R. 220).

On June 22, 2007, the claimant returned to Dr. Cunningham for treatment of her neck and back pain.  In his treatment notes, Dr. Cunningham indicated that he recommended the claimant see her medical doctor and obtain a magnetic resonance image ("MRI"); however Dr. Cunningham notes that the claimant said she cannot afford an MRI.  (R. 223).  On June 25, 2007, Dr. Cunningham completed a request for medical information for the Alabama Department of Human Resources.  He opined that the claimant was not able to work because of a "possible lumbar spine disc degeneration pending further diagnostic imaging."  Dr. Cunningham indicated that he expected the condition to be present for a minimum of six months.  (R. 225).

The claimant visited Garrett Chiropractic on January 23, 2008 and January 30, 2008 where she received an examination and treatment for her pain.  (R. 226-29).

On February 6, 2008, Dr. Robert E. Chasan, a treating radiologist, performed an MRI on the claimant.  The results revealed an incidental disc bulging at T10-11, but were otherwise

unremarkable.  (R. 231).

*Other Medical Records*

On June 26 2006, the claimant visited Eliza Coffee Memorial Hospital emergency room for a toothache and nausea.  The treating physician diagnosed her with a dental abscess and nausea; he prescribed pain medication.  (R. 168-72).  On September 2, 2006, Dianna Osborn, a treating physician at Eliza Coffee emergency room, treated the claimant for a laceration on her finger.  (R. 276).

On January 11, 2007, the claimant visited Southern Rural Health Care Consortium complaining of a low grade fever, ear pain, a cough, and sinuses.  (R. 235).  On August 10, 2007, the claimant returned to Southern Rural for a pap smear and breast examination.  The treatment notes indicated that the treating physician advised the claimant to return soon so the doctor could address her complaint of back pain.  (R. 234).  The claimant's medication chart at Southern Rural indicates that the physicians prescribed an Abreva pin for oral herpes, prenatal vitamins, and arthritis medication.  (R. 238-39).

On February 9, 2007, the claimant sought treatment at the Eliza Coffee emergency room for body aches, nausea, vomiting, and a toothache.  (R. 263).  Dr. Glaen Kiser, a treating physician, diagnosed the claimant with an abscessed tooth, a fever, and sinusitis.  (R. 269).  The Eliza Coffee emergency room treated the claimant on January 31, 2008 for complaints of right face pain.  (R. 256).  The emergency room physician diagnosed the claimant with sinusitis (inflammation of the sinuses).  (R. 261).

The claimant sought treatment at the Eliza Coffee emergency room on May 31, 2008 for a sore throat, body aches, and a fever.  The records indicated that the claimant received treatment

for viral pharyngitis (inflammation of the throat).  (R. 252).  On June 23, 2008, the claimant again visited Eliza Coffee emergency room complaining of a cough, nausea, and vomiting.  The emergency room treated the claimant for bronchitis.  (R. 241-44).  The treating emergency room physician noted that the claimant had no musculoskeletal pain or swelling, including the back. (R. 243).

### The Initial ALJ Hearing

After the Commissioner denied the claimant's request for disability insurance benefits and supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 20).  At the hearing on February 5, 2008, the claimant testified that her disability resulted from a learning disability that caused her to work slowly and pain in her back.  (R. 15-16).

The claimant's attorney stated that the claimant demonstrated a reduction in adaptive functioning as required by the section 12.05 listing.  His argument relied on the claimant's academic difficulties dating back to elementary school, diagnosis of ADHD, and depression.  (R. 6).

A vocational expert, Mr. Elliot, testified concerning the claimant's school records.  He stated that the claimant's Stanford Achievement Test scores were consistent with an IQ within the borderline range.  (R. 7).  Mr. Elliot testified that the claimant's seventh grade Alabama Direct Assessment of Writing score indicating good, solid writing would not be consistent with mental retardation and would actually fall within an average range of ability.  (R. 8).

Mr. Elliot testified that Dr. Atkinson's note of the claimant's significant difference between verbal and performance IQ would generally suggest a learning disability versus mental retardation.  Mr. Elliot opined that the full-scale IQ scores from Dr. Atkinson's evaluation were

consistent with the standardized testing done within the school.  (R. 11).  Further, Mr. Elliot

testified that the claimant, based on the school records, appeared to be intellectually functioning

within the borderline range, which would limit the claimant to unskilled work activity.  (R. 12).

Mr. Elliot further testified concerning the type and availability of jobs that the claimant

was able to perform.  He stated that an individual functioning at a borderline intellectual level

with poor language comprehension would have the ability to perform simple, routine, repetitive

types of unskilled jobs, such as an assembly of products or an inspection of products.  (R. 22).

The claimant testified concerning her difficulties resulting from back pain and mental

impairments.  She testified  that she previously worked at a baseball newspaper where she did

inserts, taking a piece of paper and inserting it into the newspaper.  She stated that while at her

job, she felt as though she was not doing as well as other people and that feeling stressed her out.

She further testified that she experienced back pain at her job because of lifting.  The claimant

stated that she quit the newspaper job because she was stressed and she wanted to return back

home to Alabama to be near her family.  (R. 13-14).

After returning to Alabama, the claimant testified that she worked as a cashier at a gas

station, but the position only lasted one week because she was too slow to perform the job.  (R.

14).  The claimant testified that her employer wanted her to learn the position within a day or two

and she was not able to do that.  (R. 17).  The claimant testified that she was sweeping floors at

this job and experienced back problems from the standing and sweeping.  The claimant testified

that the gas station fired her after one week because she was "too slow for them" and "didn't do

the right things."  (R. 15).

The claimant testified that she sought treatment for her neck and back problems from a

chiropractor, Dr. Ballard, in Mississippi prior to moving back to Alabama.  The claimant also testified that she was four feet seven inches tall and weighed 158 pounds.  (R. 16).  The claimant stated that she spent a normal day in such bad pain that all she wanted to do was lie down.  (R. 17).  Additionally, the claimant testified that in the weeks before filing for disability she would stay in bed three days a week because of her pain.  (R. 20).

When asked about her back pain, the claimant testified that a doctor told her to get a MRI, but that she could not afford to get a MRI.  (R. 21).  The claimant testified that she initially filed for disability because she knew something was wrong with her back, but she did not have the money to visit a doctor.  The claimant testified that she hoped filing for disability would help her "to see if I had a learning disability and what was wrong with my back."  (R. 19).  She stated that she had not been to vocational rehabilitation  nor did her school provide her assistance in finding a job.  (R. 21).

At the conclusion of the hearing, the claimant's attorney asked the ALJ for the opportunity to obtain an MRI of the claimant's back and hold a supplemental hearing.  The claimant's attorney stated that he would like to present the MRI as an objective basis for the claimant's back pain and discomfort that would possibly preclude sedentary work.  (R. 23).  The ALJ stated that, at the close of the first hearing, the claimant did not have a specific medically determinable impairment; however he left open the possibility of a supplemental hearing.  (R. 23-24).

*The Supplemental ALJ Hearing*

After the initial ALJ hearing, the claimant obtained an MRI of her lower back and returned before the ALJ for a supplemental hearing.  The ALJ summarized the initial hearing; he

-14-

stated "what I think we came down to was that your client is not mentally retarded because that was inconsistent with Dr. Atkinson's records in file and inconsistent with school records." The ALJ stated that the supplemental hearing that day was held to allow introduction of the MRI and "additional records." (R. 28).

A different vocational expert, Ms. Bramlett, testified concerning the type and availability of jobs that the claimant was able to perform. The ALJ asked Ms. Bramlett to assume that an individual was 25 years old, had a limited education, functioned within the borderline range of intelligence, had no work history, and had no medically determinable severe physical impairment that would restrict the claimant's functional abilities. The ALJ added that the individual, due to her intellect, would be restricted to simple, routine, repetitive work and would have no more than occasional contact with the public. Finally, the ALJ added that just as a precautionary nature, the individual was restricted from working at heights or being around dangerous, unguarded machinery. Ms. Bramlett responded that this hypothetical individual was limited to unskilled work dealing with things, rather than people. (R. 35). Ms. Bramlett stated that at the light level, jobs as a labeler, inspector, or tagger fit the hypothetical's limitations. She stated that similar jobs would exist at the sedentary and medium exertion levels as well. (R. 36).

The ALJ further questioned Ms. Bramlett by asking her to identify employment opportunities for an individual who would frequently miss one or two days of work as a result of a medically determinable impairment. Ms. Bramlett responded that the absenteeism would not be tolerated in unskilled jobs at the entry level, thus the attendance limitation would essentially rule out all jobs. (R. 37). Ms. Bramlett further testified that pain significant enough to affect an individual's ability to concentrate and perform simple, routine, repetitive work for periods of up

-15-

to two hours precluded her from performing all types of jobs.  Additionally, Ms. Bramlett testified that a pain or discomfort that frequently required an individual to take unscheduled breaks during the day ruled out all work.  (R. 37).

The claimant's attorney then asked Ms. Bramlett to comment on the vocational relevance of an IQ score of 70 on a verbal scale.  Ms. Bramlett responded that IQ scores do not provide enough information about the individual's functional limitations.  Ms. Bramlett then stated that she has placed, or has seen placed, into a work environment people with IQ scores of 70 or less.  Further, she testified, functional limitations, rather than IQ scores, were indicative of one's ability to work.  (R. 39).

Ms. Bramlett testified that a job requiring one to operate a self-service gas station for periods of time by herself fell outside of the parameters of a simple, repetitive one and two-step task position.   Finally, she stated that for all jobs, the individual must, at a minimum, be able to comprehend well enough to carry out simple tasks.  (R. 40).

*The ALJ's Decision*

On August 27, 2008, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act.  (R. 17).  The ALJ first found that the claimant had not engaged in substantial gainful activity since the alleged onset date of her disability.  (R. 10).  Next, the ALJ found that the claimant's borderline intellectual functioning qualified as a severe impairment.  (R. 10).  The ALJ concluded, however, that this impairment did not singly or in combination meet or medically equal one of the listed impairments.  (R. 13).

To support his conclusion that the claimant's borderline intellectual functioning did not meet the requirements of Section 12.05C of the Listing of Impairments, the ALJ stated that the

claimant had not sought medical treatment by a mental health professional.  The ALJ also referenced the lack of evidence that the claimant experienced "more than a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, or moderate difficulties in maintaining concentration, persistence, or pace."  (R. 13).

The ALJ next considered the claimant's subjective allegations of physical pain and mental symptoms to determine whether she had the residual functioning capacity to work.  The ALJ concluded that the claimant was able to perform a full range of work at all exertional levels as she had "no medically determinable severe physical impairment that would restrict her functional abilities."  Due to her intellect, the ALJ stated that the claimant would be restricted to simple, routine work and have only occasional contact with the public.  The ALJ found that the claimant's borderline intellectual functioning "could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment."  (R. 14).

To support his conclusion, the ALJ first considered the claimant's mental health treatment at Riverbend between 1992 and 1994.  The ALJ referenced Dr. Melvin's treatment notes, which indicated that the claimant's mother stated that the claimant had an increased attention span and improved grades when she was taking her medication.  The ALJ found that Dr. Atkinson's examination notes also supported her conclusion because they indicated (1) the claimant had a Verbal IQ score of 70, a Performance IQ score of 86, and a Full Scale IQ of 76 and (2) in Dr. Atkinson's opinion, the claimant was not severely mentally ill nor mentally retarded.  (R. 15).

-17-

For further support, the ALJ referenced Mr. Elliot's interpretation of both the school records and Dr. Atkinson's IQ test results in which he stated that neither the school test scores nor the difference between Dr. Atkinson's performance and verbal IQs were consistent with mental retardation.  Instead, as the ALJ noted, Mr. Elliot opined that the claimant's scores were consistent with a learning disability.  The ALJ emphasized that Mr. Elliot made his conclusion that the claimant was not mentally retarded, but would be limited to simple, unskilled work, after an extensive examination of the school record and questioning from the claimant's attorney.  (R. 15).

To support his conclusion regarding the claimant's residual functioning capacity, the ALJ noted that the claimant quit a previous job because she wanted to move back home to Alabama; the employer did not fire the claimant.  The ALJ also referenced the claimant's statement that she had not sought the assistance of vocational rehabilitation.  (R. 15).

In considering the claimant's allegations of back pain, the ALJ noted that the MRI scan performed subsequent to the initial hearing did not demonstrate any significant back impairment. The ALJ noted that claimant admitted to not taking any medication for her symptoms.  (R. 15).

The ALJ stated that he gave significant weight to the opinion of the consulting psychologist, Dr. Atkinson, because her opinion was based on a thorough evaluation and test results.  (R. 15).  The ALJ concluded that Dr. Atkinson's evaluation was consistent with the medical evidence of record.  The ALJ noted that he also accorded great weight to Mr. Elliot's testimony concerning the claimant's school test scores and IQ scores.  (R. 16).

The ALJ concluded that the claimant's mental impairment narrowed the jobs available to the claimant; however, the ALJ decided, based on the testimony of the vocational expert, that

even with the claimant's limitations, jobs existed in significant numbers in the regional and

national economies for an individual of the claimant's age, education, work experience, and

residual functioning capacity.  (R. 16).  Thus, the ALJ found that the claimant was not disabled

under the Social Security Act.  (R. 17).

## VI. DISCUSSION

### A. Issue 1: The ALJ's Finding that the Claimant Failed to Meet Listing 12.05C

The claimant argues that the ALJ's finding that she failed to meet section 12.05C of the

Listing of Impairments was not based on substantial evidence.  To the contrary, this court finds

that substantial evidence supports the ALJ's decision that the claimant did not meet the

diagnostic description of mental retardation, a requirement for meeting the 12.05C listing.

The Eleventh Circuit's standard for claims under section 12.05 breaks down the

diagnostic description of mental retardation and requires that "a claimant must at least (1) have

significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior;

and (3) have manifested deficits in adaptive behavior before age 22."  *Crayton v. Callahan*, 120

F.3d 1217, 1219-20 (11th Cir. 1997); *see also* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.  A

claimant generally meets the listing requirements of 12.05C when she has a valid IQ score of 60

through 70 and presents evidence of an additional mental or physical impairment significantly

affecting claimant's ability to work; however, a valid IQ score is not conclusive of mental

retardation where the IQ score is inconsistent with other evidence in the record concerning the

claimant's daily functioning.  *See Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir.1992).

In this case, the ALJ rejected the claimant's argument that she met the 12.05C listing,

despite her IQ score of 70, because the evidence showed no deficit in adaptive functioning, a

requirement under the listing.  (R.13).  The ALJ articulated adequate reasons, based on the record, to support his decision that the claimant failed to qualify as mentally retarded under the Listing of Impairments.

The ALJ stated that the evidence of record showed only a mild restriction of activities of daily living and social functioning and moderate difficulties in maintaining concentration, persistence, or pace.  To support his conclusion, the ALJ discussed the claimant's mental health treatment history and positive response to the treatment she received.  The ALJ referenced the September 1994 notes of the claimant's treating physician at Riverbend Center that indicated, while she was on Ritalin, the claimant experienced a marked increase in her attention span and a dramatic improvement in her grades.  (R. 15).  The claimant presented no evidence that she had sought any further mental health treatment beyond her treatment received at Riverbend when she was eleven years old.  (R. 14).

The ALJ further relied on the opinions of both Dr. Atkinson and the vocational expert, Mr. Elliot, who explicitly stated that the claimant was not mentally retarded.  Dr. Atkinson's notes indicated that, at the conclusion of a psychiatric evaluation, she did not find the claimant to be severely mentally ill nor mentally retarded.  Mr. Elliot testified at the initial ALJ hearing that the claimant's school records and her IQ scores from Dr. Atkinson's evaluation were not consistent with mental retardation.  Mr. Elliot opined that the large difference between the claimant's performance IQ and verbal IQ was consistent with a learning disability, not mental retardation.  (R. 15).  For additional support of his conclusion, the ALJ noted the claimant's testimony that her newspaper job did not fire her, rather she quit the job to move back home to Alabama.

-20-

In addition to the reasons cited by the ALJ, the record taken as a whole supports the ALJ's decision that the claimant did not have deficits in adaptive functioning.  In her daily activities questionnaire, the claimant stated that she cared for her own personal needs, prepared meals for herself and her husband, performed household chores, paid bills, and cared for her husband and pet.  (R. 92-94).  The claimant did not mention any functional limitations in daily care activities, except for needing help with some chores because of back pain.  (R. 95).

The claimant argues on appeal that losing her job at a gas station evidences deficits in adaptive functioning.  However, Ms. Bramlett, the vocational expert present at the supplemental hearing, testified that working as a cashier at a gas station was a job that fell outside of the parameters of simple, routine work.  Thus, the claimant's inability to do a job outside of the type of work for which she qualified fails to persuade this court that the ALJ's decision lacked the support of substantial evidence.

Substantial evidence supported the ALJ's decision that the claimant failed to meet the requirement of having deficits in adaptive functioning.  Thus, although the claimant had a valid IQ score of 70, she did not meet the standard for mental retardation.  Because the ALJ, using the correct legal standard, found that the claimant did not demonstrate deficits in adaptive functioning and he supported his conclusion with substantial evidence, the ALJ did not commit reversible error.

**B. Issues 2, 3, and 4: The Commissioner's Treatment of the Claimant's MRI, Obesity, and Chiropractor's Opinion**

The claimant argues that the ALJ ignored the results of her MRI, failed to take into account her obesity, and ignored the opinion of her treating chiropractor.  For these reasons, the

claimant asks that the court remand this case so that the claimant may obtain a consultive medical assessment and reassess her residual functioning capacity and complaints of disabling pain.  This court finds that remand is inappropriate because the evidence sought to be obtained and presented in a remand does not advance a reasonable possibility that the new evidence would change the administrative result.

For remand to be appropriate so that the claimant can provide additional evidence regarding her pain and inability to work, the new evidence to be included on remand should be material.  Evidence is material if a reasonable possibility exists that the new evidence would change the administrative result.  *See Fagle v. Apfel*, 150 F.3d 1320, 1323 (11th Cir. 1998).

In this case, the evidence the claimant seeks to procure on remand through a medical examination is not material as no reasonable possibility exists that the new evidence would change the result of the ALJ's decision.  The existing evidence in the record shows that the claimant had not alleged disabling back pain outside of a 12.05C listing, an issue already decided, and her obesity had not caused any limitations on the claimant's physical or mental ability to do work.

The 12.05C listing requires that the claimant meet the diagnostic description of mental retardation, have an IQ of 60 through 70, *and* show an additional mental or physical impairment. *See Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir.1992).  The claimant presented the issue of her back pain to prove the additional physical limitation requirement of her 12.05C claim.  (R.5). The ALJ decided, and supported with substantial evidence, that the claimant did not meet the diagnostic description of *mental retardation* – the first requirement for a listing 12.05C impairment; therefore, she could not meet the listing requirement for 12.05C regardless of her

additional physical impairment of back pain.  To remand this case base on the ALJ's treatment of

the MRI and the treating chiropractor's opinion regarding the claimant's back pain is not

appropriate because reevaluating the claimant's back pain does not create a reasonable possibility

of changing the administrative result, because such evidence would not affect the finding that

claimant did not meet the requirements for mental retardation.

Moreover, the record does not support the argument that the case should be remanded for

reevaluation of the claimant's back pain because no medical evidence provides an objective basis

for the claimant's back pain.  The record is full of numerous visits to the emergency room

following the onset date of disability; however, the claimant never complained of back pain to

the treating emergency room doctors.  (R. 241-278).  The only mention of back pain to a medical

doctor was during the claimant's women's health examination at Southern Rural.  The doctor

noted that the claimant should return to discuss her back pain, but no evidence shows the

claimant ever returned to have her back evaluated.  (R. 234).

The claimant did visit several chiropractors for treatment of her back pain.  The treatment

notes indicated that she responded well to her chiropractic treatment and achieved a relief of

pain.  The opinions of the claimant's treating chiropractors are not acceptable as objective

medical evidence, however, because chiropractors are excluded from the list of acceptable

medical resources in 20 C.F.R. §§ 404.1513(a), 416.913(a).  *See Crawford v. Comm. of Social

Security*, 363 F.3d 1155, 1160 (11th Cir. 2004).

A remand to consider evidence of the claimant's obesity would also be improper because

the claimant's obesity also does not create a reasonable possibility of changing the administrative

result.  Courts have recognized that obesity is a severe impairment when it significantly limits an

individual's physical or mental ability to do work.  *See Thomason v. Barnhart*, 344 F. Supp.2d 1326, 1330, n.12 (N.D. Ala. 2004).  The claimant argues on appeal that the ALJ should have considered the claimant's obesity based on Dr. Atkinson's note that the claimant was obese and the claimant's statement of her height and weight.  The record, however, presents no evidence that obesity had ever caused this claimant any work related limitations.  In measuring the severity of an ailment, the condition "must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality."  *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986).  Thus, the claimant's obesity did not limit her ability to work in any way and cannot be a severe limitation in this case, despite the fact that obesity can, in other cases, be a severe impairment.

Based on the standard for remand, this court concludes that to remand this case in order to obtain a medical examination and reassess the claimant's residual functioning capacity would be inappropriate because the new evidence the claimant could obtain is not material evidence that presents a reasonable possibility of changing the administrative result.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence as is to be AFFIRMED.  The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 28th day of June 2010.

_Karon O. Bowdre_

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE